# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 9:25-cv-80368-WPD (Dimitrouleas/Reinhart)

LESLIE B. DANIELS and
100 EVERGLADES, LLC,

   Plaintiff,

vs.

TOWN OF PALM BEACH, FLORIDA,

   Defendant.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORADUM IN SUPPORT

### INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 56, Plaintiffs 100 Everglades, LLC, and Leslie B. Daniels (together, "Daniels") hereby move the court for summary judgment on Count I and Count III of the complaint. DE 1. This motion is based on the complaint, and exhibits thereto, the Statement of Material Facts (SMF) and exhibits filed concurrently with this motion, and the following memorandum of law.

This case arises from Defendant Town of Palm Beach's (Town) recent implementation of policies and practices which allow the public to use a parcel of sandy beach property owned by Daniels, depriving Daniels of his right to exclude the public, *see* SMF ¶ 1; *id.* ¶ 41, resulting in an unconstitutional taking of property.

Now, for the first time in Daniels' two decades of ownership, the Town asserts that Fla. Stat. § 161.141 authorizes it to assert a public easement on Daniels' private beach land, and to deprive Daniels of his right to exclude. But Fla. Stat. § 161.141 does not impose a public easement on private beach land merely because a renourishment project adds sand to the land. Instead, the statute ensures that public rights lawfully established on private uplands prior to renourishment are not extinguished by the project. No public rights have ever been established on Daniels' sandy beach property. Thus, as applied to impose an easement on Daniels' property, Fla. Stat. § 161.141 is itself a taking.

In sum, because (1) the Town's policy and practices allow members of the public to use Daniels' land and prevent him from excluding them, and (2) Fla. Stat. § 161.141 did not create an easement justifying the Town's policies, the Town has unconstitutionally taken Daniels' property. *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 950 (11th Cir. 2018) (upholding a takings judgment because "public trespassing and occupation of their property was the natural and intended effect of the City's actions"); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (finding a regulation caused a per se taking because "[r]ather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude"). Furthermore, in applying a Town ordinance to prohibit Daniels from placing posts and cones on his sandy beach property with signage saying, "Private Property. No Trespassing," the Town violated Daniels' right to free speech. *See Alford v. Walton Cnty.*, No. 3:16cv362, 2017 WL 8785115 (N.D. Fla. Nov. 22, 2017) (a prohibition on "private property" and "no trespassing" signs on private sandy beaches violated the First Amendment).

## FACTS AND PROCEDURE

### A. Background Florida Law

Under Florida law, the default boundary between private and public beach property is the Mean High Water Line (MHWL). The state owns beach property lying seaward of the MHWL in trust for certain public uses, but property landward of the MHWL is privately owned. *Walton Cnty. v. Stop Beach Renourishment, Inc.*, 998 So. 2d 1102, 1113 (Fla. 2008) (discussing nature and effect of the MHWL). The MHWL cannot be determined by looking at the visible water line. This is because the MHWL is calculated as the average of daily high tide lines over an 18.6-year period. *Id.* The MHWL is an ambulatory line, and professional survey methods are necessary to find the MHWL. *See Rhoads v. Virginia-Florida Corp.*, 549 F.2d 985, 987-88 (5th Cir. 1977) (testimony regarding the location of MHWL was insufficient where it was not based upon proper observations over a full tidal cycle).

Under state law, a local government seeking to carry out a beach renourishment project must establish an Erosion Control Line (ECL) along the beach areas to be renourished. The ECL is generally placed at the MHWL that existed prior to the project. Fla. Stat. § 161.161(5). Once established, the ECL becomes the fixed post-renourishment boundary between state-owned beach lands and private areas landward of the MHWL/ECL. Fla. Stat. § 161.151(3).

Fla. Stat. § 161.141 discusses some of the implications of a beach renourishment project on private land above the ECL. The provision states, in relevant part:

> 161.141. Property rights of state and private upland owners in beach restoration project areas.—The Legislature declares that it is the public policy of the state to cause to be fixed and determined, pursuant to beach restoration, beach nourishment, and erosion control projects, the boundary line between sovereignty lands of the state bordering on the Atlantic Ocean . . . and the upland properties adjacent thereto . . . . However, prior to construction of such a beach restoration project, the board of trustees must establish the line of mean high water for the area to be restored; and any additions to the upland property landward of the established line of mean high water which result from the restoration project remain the property of the upland owner subject to all governmental regulations . . . . The resulting additions to upland property are also subject to a public easement for traditional uses of the sandy beach consistent with uses that would have been allowed prior to the need for the restoration project.

Fla. Stat. § 161.141 further states:

> It is further declared that there is no intention on the part of the state to extend its claims to lands not already held by it or to deprive any upland or submerged land owner of the legitimate and constitutional use and enjoyment of his or her property. If an authorized beach restoration, beach nourishment, and erosion control project cannot reasonably be accomplished without the taking of private property, the taking must be made by the requesting authority by eminent domain proceedings. In any action alleging a taking of all or part of a property or property right as a result of a beach restoration project, in determining whether such taking has occurred or the value of any damage alleged with respect to the owner's remaining upland property adjoining the beach restoration project, the enhancement, if any, in value of the owner's remaining adjoining property of the upland property owner by reason of the beach restoration project shall be considered. If a taking is judicially determined to have occurred as a result of a beach restoration project, the enhancement in value to the owner's remaining adjoining property by reason of the beach restoration project shall be offset against the value of the damage, if any, resulting to such remaining adjoining property of the upland property owner by reason of the beach restoration project, but such enhancement in the value shall not be offset against the value of the property or property right alleged to have been taken. If the enhancement in value shall exceed the value of the damage, if any, to the remaining adjoining property, there shall be no recovery over against the property owner for such excess.

Despite being on the books for 60 years, no court has interpreted Fla. Stat. § 161.141 to impose a public easement on the land on private land solely because it was subject to the replacement of sand.

### B.  Daniels' Property

In 2004, 100 Everglades, LLC (Everglades) acquired certain beachfront property located at 100 Everglade Avenue, Palm Beach, Florida 33480 (the "Property"). SMF ¶ 1. The Property sits at the corner of Everglade Avenue and N. Ocean Boulevard, which runs north and south along the Atlantic Coast, parallel to the ocean. Leslie Daniels is the sole managing member of Everglades. Daniels leases the Property from 100 Everglades pursuant to a 99-year lease agreement dated December 16, 2010. SMF ¶¶ 2-3. The Property is Daniels' homestead residence, and Daniels has resided at the Property part-time since 2004. SMF ¶ 3.

Title to the Property includes an area of land situated seaward of N. Ocean Boulevard, between Wells Road and Sunset Avenue (the "Beach Parcel"). SMF ¶ 8. This Beach Parcel area runs north and south, parallel to the Atlantic Ocean, for approximately 166.75 feet. It also extends eastward, toward the ocean waters, approximately 90 feet, ending on its seaward side at the ECL. SMF ¶¶ 8-10. This parcel, like Daniels' Property as a whole, is located between Wells Road and Sunset Avenue. SMF ¶ 8.

A concrete seawall exists on the Beach Parcel. SMF ¶ 9. Landward of the seawall, Daniels owns and maintains a small brick pad and beach cabana. *Id.* On the seaward side of the seawall, Daniels owns an area of sandy beach property down to the ECL. SMF ¶ 10. This area of land is the subject of this suit. The shape and width of Daniels' sandy property varies depending on the tides, seasons, and supply of sand. Sometimes, such as at very high tides, it is covered by some water. SMF ¶ 12. At other times, it is a dry sandy beach. *Id.* Daniels uses his sandy beach for personal use and family gatherings. SMF ¶ 11.

There is no recorded public access easement on Daniels' title. When Daniels purchased the Property, he had no notice or knowledge of any claim of a public easement on the sandy parcel located landward of the ECL. No prescriptive easement has been proven and adjudicated on Daniels' land. Neither Daniels nor his predecessors-in-interest have ever dedicated the Property for public use. SMF ¶¶ 4-7.

For the vast majority of Daniels' ownership, the Town (correctly) recognized that beach areas lying seaward of the ECL/mean high water mark are public areas, but property landward of the ECL is private. SMF ¶ 13; *id.* ¶¶ 30-31. Further, in this period, the police generally responded to complaints about trespassing on private lands and moved unwanted trespassers from such properties. SMF ¶ 13. Daniels has always defended the private nature of his sandy beach property,

by requiring permission for its use by non-owners and by excluding unwanted strangers. SMF ¶¶ 14-15.

### C. Beach Renourishment

In 2003, the Town established an ECL on the beaches between Wells Road and Sunset Avenue, where Daniels' Property lies, in preparation for a Town-conducted beach renourishment project. SMF ¶ 16. The 2003 renourishment project subsequently occurred on Daniels' sandy beach parcel pursuant to a Temporary Construction Easement executed by Daniels' predecessors-in-interest in 2002. *Id.* The 2002 Easement gave the Town a nonexclusive easement for the purposes of

> constructing, implementing and maintaining the Mid-Town Beach Nourishment and Expansion Project and shall include, without limitation, the right to utilize the Easement Property for enlarging and maintaining the beach and shoreline by filling with compatible sand, for removing derelict erosion control structures and other debris that pose a safety hazard, and for planting and maintaining native dune vegetation to prevent further erosion of the shoreline.

*See* SMF ¶ 17.

The 2002 Easement granted the Town access to the Property only for the stated purposes of completing and maintaining the renourishment project. Nothing in the 2002 Easement granted a public easement on Daniels' Property. SMF ¶¶ 17-18. After the 2003 project, the Town did not assert that the project had imposed a public beach easement on Daniels' sandy parcel. In approximately 2006, another renourishment project occurred around Daniels' Property under the still-effective 2002 Easement. Again, the Town did not claim that the project created a public easement on Daniels' land. *See* SMF ¶¶ 23-24.

In 2014, the Town planned another renourishment project on the beaches around Daniels' sandy parcel. In December of 2014, Daniels executed a new Temporary Easement allowing the 2014 Project (the "Temporary Construction Easement") on his Property. *See* SMF ¶¶ 20-21. The 2014 Easement, which by its terms would expire in 2023, contained language almost identical to the 2002 Easement. The 2014 Easement provided that "[n]othing herein shall be deemed to be a gift, grant, or dedication to or for the general public and this Easement shall be strictly limited to and for the purposes expressed herein." SMF ¶ 21. The Town did not claim before, during, or after the 2014 project that renourishment of Daniels' private sandy land created a public easement on that land. SMF ¶¶ 23-24.

In 2019, the Town planned for another beach renourishment project, this time with potential funding and participation of the Army Corps of Engineers. In 2019, the Town asked Daniels and other owners of private beach lands to execute new perpetual easements allowing the project to proceed on their beach properties. But the proposed new renourishment easement granted not just construction access to subject properties, but also a perpetual right of public access and use. Daniels and other beachfront property owners refused to sign the new easements due to the public access/use provisions. SMF ¶¶ 25-26.

### 1. The Town's 2021-2022 policy reversal to allow public use of Daniels' Property

In 2020, the Town still adhered to its historic understanding that sandy beach properties lying landward of the ECL are private and not open to the public. Then around March 2020, the Town produced an aerial photo-map showing the ECL along the beaches containing Daniels' sandy parcel. The photo stated: "The ECL denotes the public/private boundary . . . ." SMF ¶ 31. Later in 2020, Captain Rothrock sent out an email to police officers which contained a "Beach Accessibility" map for "Reach 3" of the Town's beaches, which includes Daniels' Property. The map showed that the "public" beach terminated at the ECL, and that beach areas landward of the ECL, like Daniels' land, are "private." SMF ¶ 32.

In August 2020, the Palm Beach Police Department announced that it would enforce trespassing claims on sandy beach property between Wells Road and Sunset Avenue (where Daniels' property is located), if the owners visibly marked their property boundaries. SMF ¶ 33. Town officials instructed the property owners to mark their boundaries with "monoposts," which are single free-standing posts spaced approximately 10 feet apart, and stated that such monoposts did not require a Town permit. *Id.* The Town police subsequently confirmed that, once the posts were installed, the police would enforce trespassing laws on private sandy beaches, like Daniels'. *Id.* Daniels soon put up monoposts around the boundary of his sandy beach property, including down to its seaward border at the ECL. SMF ¶ 34. Some of the posts contained the message "Private Property." *See* SMF ¶ 35. Daniels' purpose in placing the posts was "[t]o let the public know that it was private property." *Id.*

In November of 2020, then-Lieutenant Rothrock of the Police Department sent an email to officers informing them that property owners had installed posts marking their property boundaries and advising that the posts could be utilized for trespass enforcement. SMF ¶ 37. Thereafter, while the posts were in place for approximately a year, the police responded to calls about trespassing

on private sandy beach property, telling those within the marked areas to move away. SMF ¶ 38.
As Police Chief Caristo testified:

> Q: Okay. But if they posted their property the officers would come out and they would tell people to move along, correct?
>
> A: Yes.
>
> Q: And in your experience, people uniformly complied with the officers' requests?
>
> A: Yes.

SMF ¶ 38. Town officials understood that the Town was thereby assisting property owners in excluding members of the public:

> Q: [A]re you aware that the Town assisted property owners in marking their properties to exclude members of the public from their property; correct?
>
> A: Yes, I am aware of that.

SMF ¶ 36.

Sometime in 2021, the Town began to shift its position regarding public use of private beaches between Wells Road and Sunset Avenue. In 2021, the Town published a Frequently Asked Questions (FAQ) document specific to the beaches between Wells Road and Sunset Avenue. The FAQ stated that the public had a right to access the beaches in that area, regardless of public or private ownership. SMF ¶ 39. In October of 2021, the Town Attorney and Town Coastal Coordinator instructed Police Captain Rothrock that "the public had a right to traditional use of private beach property above the ECL where there had been beach renourishment." SMF ¶ 40.

Soon after, on October 22, 2021, Rothrock sent an internal email to all police officers explaining "the following changes in policing the beach with regards to trespassing complaints until further notice.

- There is a strong argument that the public has an easement for "traditional beach use" . . . where sand re-nourishment has occurred above an Erosion Control Line (ECL), which is the vast majority of the Town's unimproved sandy beaches.

- When officers are addressing beach trespass complaints, they should explain this as necessary to complainants[.]

- Non-consensual contacts, arrests, and trespass warning should not be made based solely on trespassing complaints on unimproved sandy beaches where subjects are conducting reasonable traditional beach use.

In summary, if an officer is called to the scene, they should explain this to a complainant,

. . . but take no other action."

SMF ¶ 41.

On January 10, 2022, Rothrock sent an email to a neighbor of Daniels (George Cloutier), which Daniels viewed. Rothrock's email stated that the Town was "considering that the public has an easement for traditional beach use where sand re-nourishment has occurred above an Erosion Control Line (ECL), which is the vast majority of the Town's unimproved sandy beaches." The email further stated: "Non-consensual contacts, arrests, and trespass warnings will not be made based solely on trespassing complaints on unimproved sandy beaches where subjects are conducting reasonable traditional beach use." SMF ¶¶ 45-46.

Town officials have acknowledged that the change in Town policy regarding public use of private beaches, and related police directive to take no action about trespassing on such lands, meant Daniels could not exclude the public from his private land. For instance, Police Captain Guelli testified that, after October 22, 2021, he understood that Town policy allowed the public "use the beach in a traditional beach usage" "right up to any like improved areas." SMF ¶ 44. Similarly, Police Chief Caristo testified:

> Q. . . . . "I mean the practical effect of that [October 22, 2021] directive is that property owners can no longer remove members of the public from their private property. Isn't that true?
>
> A. The dry sand portions.
>
> Q. Correct. The dry sandy portions of their property. That's a particular effect of that directive, is it not?
>
> A. Yes.

SMF ¶ 43.

### D. The Town's Prohibition of Posts and Cones and Signage that Kept the Public Off Daniels' Property

On April 14, 2022, the Town suddenly reversed its prior position regarding the property owners' use of monoposts to mark the boundaries of their sandy property. The Town sent Daniels a Notice of Code Violation informing him that his posts violated Section 134-1473 of the Town Code and had to be removed. SMF ¶ 48. Section 134-1472 allows only certain "uses and structures" on the beach, specifically stating: "The permitted uses and structures in the Beach Area district are as follows: (1) [s]wimming pools and associated appurtenances associated with a pool,

(2) Beach chair and umbrellas. (3) Seawalls, dune cross overs and stairs. (4) Special events as defined in Section 106-256 and approved by the town." Under Town code Section 134-1472(a), if an item is not specifically listed in Section 134-1472, it is a prohibited "structure" on the beach. The Town subsequently held a code enforcement hearing, where it affirmed that Daniels' monoposts violated Section 134-1472. As a result, Daniels removed the monoposts. SMF ¶¶ 48-50.

Thereafter, Daniels began placing small plastic cones along the boundary of his sandy beach property. Some of the cones contained the message, "Private Property. No Trespassing." SMF ¶ 51. Daniels placed the cones on his beach land in the morning and removed them at night. Daniels used the cones to inform the public that the marked area was private property and off-limits. SMF ¶¶ 51-52. In January of 2023, Daniels received a Code Violation Warning from the Town informing him that the cones were also prohibited structures under Section 134-1472 of the Town Code, and that they had to be removed. SMF ¶ 54. Daniels complied. SMF ¶ 55. By that time, the posts, cones and their signage had kept people off Daniels' beach land for about a year and a half. SMF ¶ 56.

At one point after the removal of the posts and cones, Daniels found people on the sandy beach portion of his Property. When he asked them to move, they refused, telling Daniels that his property was a "public beach." Daniels called the police, who subsequently told Daniels that they would not remove the trespassers. SMF ¶ 58.

On another occasion, Captain Guelli told Daniels that his sandy beach was public property. Guelli stated that "the Town" had told Guelli that Daniels' sandy beach was "public property." SMF ¶ 59. In March of 2023, the Town Council president, Maggie Zeidman, also told Daniels that his sandy beach land was "not" "private property." SMF ¶ 60.

Town officials continue to take the official position that members of the public have a right to use Daniels' Property and that Daniels cannot exclude them. SMF ¶¶ 57-62. For instance, Palm Beach Police Chief Nicolas Caristo testified that:

Q. . . . . given that the Department has taken the position that members of the public can utilize the privately owned dry sand beach areas, that means that they can remain on Mr. Daniels' private sand beach area as late as they want. Isn't that correct?

A. Traditional use.

Q. Okay. For traditional use. So if they're just going to sit there all night with their friends at 2:00 in the morning, they have a right to do that?

A. Yes . . . .

SMF ¶ 62.

Similarly, Kirk Blouin, the Town Manager, testified:

A. The public has use of all the land, all the dry sand on the beach on all that entire area between Sunrise and Wells, and specifically the area in front of Mr. Daniels' house up to Everglades Avenue. . . .

Q. So let me ask you this. If one of the property owners -- if Mr. Daniels wanted to hire his own private security and have them monitor his private beach property 24/7 and shoo people off of his private property. Could he do that?

A. He would probably be subject to civil action. . . . I would tell the security you can't do that. They [the public] have a right to be there.

SMF ¶ 63.

**E. Procedure**

On March 20, 2025, Daniels filed a complaint against the Town pursuant to 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments to the United States Constitution. The complaint alleged that the Town had violated his First Amendment right of free speech, his Fifth Amendment right to be free from a taking of property without just compensation, and his right to due process of law.

More specifically, Daniels asserted that the Town had violated Daniels' rights under the Fifth Amendment's Takings Clause through an official policy that "deprived [Plaintiffs] of the fundamental right to exclude others from their private beach property." Daniels' complaint also alleged that the Town had violated his First Amendment rights by prohibiting the placement of posts and cones with "Private Property" signage on his Property and by retaliating against him. The complaint further alleged that the Town's actions had deprived Plaintiffs of procedural due process.

On May 8, 2025, the Town filed a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. DE 18. On August 18, 2025, the Court granted and denied the motion in part. DE 26. The Court dismissed Daniels' First Amendment retaliation claim and his procedural due process claim. However, the Court denied the Town's motion with respect to

Daniels' First Amendment claim based on the prohibition of posts/cones and his Fifth Amendment takings claim. DE 26 at 5-8, 12-15.

In addressing the First Amendment signage claim, the Court concluded that, "because the Court infers that the monoposts contained expressive words, and because the Plaintiffs have alleged that they have no alternative channel of communication for those expressions, the Court denies the Town's Motion as to Plaintiffs' as-applied First Amendment challenge, Count III." DE 26 at 12.

With respect to the Takings claim, the Town argued that Fla. Stat. § 161.141 authorized the public to use private renourished beach properties, including Daniels', and justified the Town in preventing owners from excluding the public. However, the Court declined to resolve the issue at the motion to dismiss stage, holding that because "Plaintiffs have sufficiently stated allegations to support their takings claims, and because outstanding questions of fact—and accompanying applications of law—are required to determine whether Section 161.141 created a pre-existing public easement, the Court declines to dismiss [the takings claim in] Count I at this motion-to-dismiss stage." DE 26 at 19.

The Town also raised a statute of limitations defense in connection with its assertion that Fla. Stat. § 161.141 authorized policies and practices that interfered with Daniels' right to exclude others from his sandy beach land. But again, the Court declined to address this defense at the motion to dismiss stage, concluding, "[b]ecause the statute of limitations question goes hand-in-hand with the question of whether Section 161.141 creates a public easement, this affirmative defense is better addressed in a motion for summary judgment or judgment on the pleadings." DE 26 at 20.

Daniels now moves for summary judgment on Count I (Takings Clause) and Count III (First Amendment) of the complaint.

## ARGUMENT

## I.   DANIELS IS ENTITLED TO SUMMARY JUDGMENT ON HIS TAKINGS CLAIM

### Background Takings Law

The Takings Clause of the Fifth Amendment prohibits uncompensated takings of private property. U.S. Const. amend. V.  A per se "taking" occurs when government action authorizes a physical invasion of private property. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538-39 (2005). Indeed, a physical occupation constitutes a taking without regard for the public purpose

for the invasion, its size, or its duration. *Cedar Point*, 594 U.S. at 152-53. Perhaps the most obvious example of a per se, physical taking arises when the government invades property for its own use. But a per se taking also occurs whenever the government authorizes third parties, such as members of the public, to access private land. *Id.* at 149-50; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 833 (1987); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).

One of the principle signs of a physical taking of real property rights is the destruction of the owner's right to exclude others from their property. The right to exclude is, of course, a fundamental and compensable property interest. *Cedar Point*, 594 U.S. at 149 ("The right to exclude is 'one of the most treasured[.]'" (citation omitted)); *Alford co-Trustee of Lionel D. Alford, Jr., & Tammy Nix Alford Revocable Tr. v. Walton Cnty.*, 159 F.4th 844, 854 (11th Cir. 2025); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *id.* at 179-80 ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, . . . cannot [be] take[n] without compensation." (footnote omitted)); *Nollan*, 483 U.S. at 831-32. Consequently, when the government prevents a property owner from lawfully excluding third parties who seek to access the owner's land, the government takes a compensable property right and is liable for a per se unconstitutional taking. *Nollan*, 483 U.S. at 831-32; *Cedar Point*, 594 U.S. at 150 ("Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation.").

Government actions that divest an owner of their ability to exclude others from their property are sometimes characterized as the taking of an "easement" on behalf of third parties. *Cedar Point*, 594 U.S. at 150-51. But regardless of whether one characterizes the authorization of third-party access to private property as a physical invasion or an easement, the point is that such interference with the owner's right to exclude causes an unconstitutional taking. *Id.*; *Nollan*, 483 U.S. at 834 ("requiring uncompensated conveyance of the [access] easement outright would violate the Fourteenth Amendment"); *Kaiser Aetna*, 444 U.S. at 180; *Chmielewski*, 890 F.3d at 950-51.

### A. The Town Took Daniels' Property by Appropriating His Right to Exclude Others
#### 1. The Town's Policy and Practices Effect a Per Se Taking

In this case, the Town's policy and practice of allowing public use of Daniels' Property and preventing him from excluding the public affects an unconstitutional taking of property. The

relevant Town practices and actions include:

- Adopting and implementing an official police directive refusing to remove trespassers from Daniels' property because the Town decided the public had a right to use his land, SMF ¶¶ 40-41;

- Requiring Daniels to remove monoposts which excluded the public from his property, SMF ¶ 48;

- Requiring Daniels to remove temporary cones which excluded the public from his property SMF ¶ 54,;

- Publishing a FAQ document stating that the public had a right of access on privately owned beach lands, like Daniels', SMF ¶ 39;

- Refusing to remove members of the public from Daniels' land after Daniels asked the people to leave, and then called the police, SMF ¶ 58;

- Town officials, including the Town Manager, Chief of Police, and President of the Town Council, repeatedly told Daniels that his sandy beach property was no longer private, but public. SMF ¶¶ 59-60;

- Acknowledging that the Town "recognized" a public easement on Daniels' land in 2021. DE 18, at 8.

Here, the Town does not dispute that its official position is that (1) the public has a right to use Daniels' sandy beach parcel, DE 18 (Motion to Dismiss) at 8-9 (The "Town's legal counsel advises the public has traditional use rights to the [Daniels] Renourished Beach pursuant to Florida law."), *see also*, SMF ¶ 63 (Blouin Depo. Tr. at 63-65); and (2) Daniels has no way to lawfully exclude the public from his property. DE 18 (Motion to Dismiss) at 9 ("Under the circumstances, the Town does not even have probable cause to cite or enforce trespass for the public's use of the Renourished Beach."). Because the natural, intended and actual effect of the Town's policy and practice is public use of Daniels' Property, and frustration of his right to exclude the public, SMF ¶¶ 47, 58-59, the Town is liable for taking his property. *Chmielewski*, 890 F.3d at 950; *Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.*, 953 F.2d 600, 604-05 (11th Cir. 1992) ("When the government appropriates an owner's right to exclude another's physical presence without paying the owner just compensation, the government violates the Takings Clause.").

### 2. Fla. Stat. § 161.141 cannot be construed to independently create a public easement on renourished private beach land

The Town contends it is authorized by Fla. Stat. § 161.141 to allow public use of Daniels' beach property, and to deny his right to exclude the public. The Town more specifically claims that Fla. Stat. § 161.141 creates a public easement on any private sandy property subject to beach renourishment, and that this divests the property owner of their right to exclude others. DE 25, at 1-3. In so arguing, the Town relies heavily on language in Fla. Stat. § 161.141 stating that the "resulting additions [of sand] to upland property are also subject to a public easement for traditional uses of the sandy beach consistent with uses that would have been allowed prior to the need for the restoration project."

The Town's belief that this language creates a public easement on any private beach land renourished with sand is flawed and, ultimately, unconstitutional. First, and most obviously, Fla. Stat. § 161.141 does not state that the addition of sand to private lands itself establishes a public easement. It states that, after renourishment of private beach property, a public easement exists "consistent with [public] uses *that would have been allowed prior to*" the renourishment project. In other words, if public uses were "allowed" on renourished private property *before* sand was added, *the same public uses* are allowed *afterward* in the form of an "easement." Thus, on its face, Fla. Stat. § 161.141 simply works to preserve the pre-project status quo with respect to public (and private) rights on private beach lands. *See Stop Beach Renourishment*, 998 So. 2d at 1115 ("[A]t least facially, there is no material or substantial impairment of these littoral rights under the Act."); Fla. Stat. § 161.141 ("there is no intention on the part of the state to extend its claims to lands not already held by it").

The context of the language at issue further confirms a "preserve the status quo" construction of Fla. Stat. § 161.141. Consider the sentence immediately preceding the "easement for public uses allowed prior to renourishment" language. That preceding sentence states, "any additions [of sand] to the upland property landward of the established line of mean high water . . . remain the property of the upland owner subject to all governmental regulations."  Read in light of this passage, the subsequent language stating that a public easement exists after addition of sand "consistent with [public] uses that would have been allowed prior to" the sand simply affirms that

the private owner's ownership of the new sand does not extinguish any rights attached to the prior area.

The Town's anti-textual view that Fla. Stat. § 161.141 independently imposes a public easement on private lands subject to renourishment is not only mistaken as a matter of statutory interpretation, but also untenable. Despite Fla. Stat. § 161.141 being in place for approximately sixty years, no Florida court has ever construed it to mean that renourishment of private land automatically installs an uncompensated public easement on the land.  Adopting such a construction now would mean that the vast tracts of private Florida beach lands that have been renourished in the past instantly became public area, without agreement from, or even proper notice to, the owners. Such a development would shock the many beachfront owners (like Daniels) who authorized past renourishment projects on their land pursuant to easement agreements that expressly allowed only project-related access to the land, not public use.

Moreover, construing Fla. Stat. § 161.041 to impose a public easement on any private land subject to renourishment, without regard for past uses, present circumstances, or compensation, would turn Fla. Stat. § 161.041 into an unconstitutional taking. *Nollan*, 483 U.S. at 834 ("requiring uncompensated conveyance of the [beach access] easement outright would violate the Fourteenth Amendment"); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010) (A taking occurs when a law "recharacterize[s] as public property what was previously private property."). This reality requires the Court to search for a plausible, alternative interpretation of Fla. Stat. § 161.141. *Cable Holdings*, 953 F.2d at 605 ("Because the district court's interpretation of Section 621(a)(2) creates significant constitutional problems regarding the government's ability to condition a property owner's right to exclude, we must search for a construction of the Cable Act more consistent with the demands of the Takings Clause."); *Jennings v. Rodriguez*, 583 U.S. 281, 296-97 (2018) (If a construction of a statute raises serious constitutional questions, courts must adopt an alternative construction so long as it is "plausible," "fairly possible," or "reasonable."). Fortunately, as discussed above, a plausible, reasonable, and constitutional construction of Fla. Stat. § 161.141 is readily apparent: the provision simply recognizes that public uses lawfully established on private beach lands prior to renourishment continue to exist after renourishment. Under this view, Fla. Stat. § 161.141 does not impose a public easement on private land merely because sand is added. It preserves public rights lawfully established prior to renourishment.

### 3. If Fla. Stat. § 161.141 creates a public easement, it effects an unconstitutional taking as-applied to Daniels

If Fla. Stat. § 161.141 is construed to create a public easement on private beach land when it is renourished with sand, as the Town contends, then the Town's recent and sudden application of the statute to claim an easement on Daniels' beach parcel takes his property. Recall, that the Town never asserted until this litigation (either in writing or orally) that the placement of sand on Daniels' property created an easement there under Fla. Stat. § 161.141. SMF ¶¶ 23-24. While it carried out renourishment projects on Daniels' land, the projects occurred pursuant to easement grants that disclaimed any grant of public rights. SMF ¶¶ 21-22. The Town acknowledges that it was not until October 2021 that it "recognized" existence of a public easement on Daniels' land under Fla. Stat. § 161.141, DE 18 (Motion to Dismiss) at 8, a position Daniels only became aware of in this litigation.

As applied by the Town to assert a public easement on Daniels' sandy beach property, Fla. Stat. § 161.141 unconstitutionally takes his property. *Cedar Point Nursery* is instructive. *Cedar Point* involved a takings challenge arising from a labor access regulation dating to the 1970's. 594 U.S. at 144. The regulation authorized labor organizers to access private property. *Id.* When organizers sought to enter the land of a private nursery and a packing company under authority of the regulation, the property owners asserted that older regulation effected an unconstitutional taking as applied to the owners. *Id.* at 145; *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 531 (9th Cir. 2019). The Supreme Court agreed, concluding that the regulation caused a taking "by appropriating without compensation an easement for union organizers to enter their property." *Cedar Point,* 594 U.S. at 145, 162.

A similar analysis applies here with respect to the Town's application of Fla. Stat. § 161.141 to Daniels. No easement exists on Daniels' title. No prescriptive or dedication-type easement has been adjudicated and proven on his land. SMF ¶¶ 4-6. Daniels never allowed unrestricted public use of his dry sandy property before or after its renourishment. SMF ¶ 14. Therefore, the Town's present attempt to claim a public easement on Daniels' property under Fla. Stat. § 161.141 takes an interest in his land, authorizes public use, and destroys Daniels' right to exclude others, causing a taking. *Cedar Point*, 594 U.S at 150-52; *Kaiser Aetna*, 444 U.S. at 180 (taking occurs "even if the Government physically invades only an easement in property").

Ultimately, this takings case is somewhat unusual and easier than many others, because the Town admits that it approves of and protects public use of Daniels' privately owned sandy beach parcel, while it refuses to recognize Daniels' right to exclude others. DE 18 at 8-9. The Town's contention that this is nothing new, that Daniels' Property has been burdened with an easement for decades, is simply not borne out by the record. The Town recognized and protected Daniels' private property and right to exclude the public until very recently. SMF ¶¶ 13, 37-38. Of course, the Town is entitled to change its policies. But it cannot allow and enable public use of Daniels' land, and eviscerate his right to exclude, without paying just compensation. *Cedar Point*, 594 U.S at 150-54.

## II.  DANIELS IS ENTTILED TO SUMMARY JUDGMENT ON HIS FIRST AMENDMENT CLAIM

### A.  Relevant First Amendment Law

The First Amendment prohibits laws "abridging the freedom of speech," a limitation that applies to the Town through the Fourteenth Amendment. *City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994). Free speech is "among the fundamental personal rights and liberties," *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938), and is an "indispensable condition, of nearly every other form of freedom." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967) (quoting *Palko v. Connecticut*, 302 U.S. 319, 327 (1937)).

First Amendment protections do not just cover oral communication; they apply to written communication, including through the use of signs. *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977); *Baldwin v. Redwood City*, 540 F.2d 1360, 1366 (9th Cir. 1976) ("Communication by signs . . . is virtually pure speech."). Signs conveying political, commercial, or other information are a "venerable means of communication that is both unique and important." *City of Ladue*, 512 U.S. at 54. Moreover, the First Amendment not only protects explicit speech, like that on signs, but also "conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984).

The First Amendment right to communicate is especially strong on private property. *City of Ladue*, 512 U.S. at 58. When seeking to restrict messages and speech on private property, such as through signage, the government bears the burden of justifying its restrictions. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). It may not restrict "speech substantially more

than necessary to further a legitimate government interest, and it must leave open adequate alternative channels of communication." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).

**B.   The Town's Prohibition of Daniels' Expressive Cones and Posts Violates the First Amendment**

In this case, the Town determined that the posts and cones which Daniels placed on his sandy beach land with the message "Private Property" are impermissible "structures" that violate Section 134-1472 of the Town Code. SMF ¶¶ 48-54. Daniels purposefully erected the posts and cones to communicate with the public about his property. SMF ¶ 35. The Town's application of Section 134-1472 to prohibit Daniels' posts and cones with signage violates the First Amendment because it bans too much speech on private property and leaves Daniels without adequate alternative means to communicate to the beach-going public about his Property.

**1.   The Ban on Daniels' Expressive Posts and Cones Fails To Leave Open Adequate Alternative Channels**

*City of Ladue* is the leading case with respect to speech on private property. There, an ordinance prohibited the display of any signs on residential property except "residence identification" signs, "for sale" signs, and safety signs. *City of Ladue*, 512 U.S. at 45, 54. Margaret Gilleo raised a First Amendment claim against the ordinance because display of an anti-war sign. *Id.* at 45. Residents could still stand in front of their homes with a sign, hang a flag from their property with the same message, hand out leaflets, or take out newspaper advertisements. But in the Court's eyes, these were not adequate alternative channels, as compared to a sign. *Id.*

The *Ladue* Court explained: "Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else or conveying the same text or picture by other means." *Id.* at 56-57 & n.16. A sign on private property conveys information about the speaker and allows the owner to convey information to others in a way that "could not be reached nearly as well by other means." *Id.* Based on these concerns, the Court struck down the subject sign prohibition. In so doing, the *Ladue* Court relied in part upon its earlier decision in *Linmark*, 431 U.S. at 88, which found a ban on "For Sale" and "Sold" signs on private property unconstitutional due to the lack of reasonable alternative communication channels. *Id.* at 85.

*City of Ladue* and *Linmark* control here. As in those cases, the Town's application of its code to bar the placement of monoposts and temporary cones with signage denies Daniels a modest, inexpensive, and effective way to communicate about his beach property to beachgoers.

As *Linmark* recognizes, speech about property is most effective when it occurs on the property to which the speech refers. 431 U.S. at 88. It is particularly important for sandy beach owners like Daniels to post messages on the borders of their beach property because their objective is not just to communicate information to beachgoers, but to do so at a particular place and time, as strangers approach their land. Posting small, advisory border signs is the only reasonable way to do this.

The Town may argue Daniels could yell at those passing by, hand out leaflets, or perhaps hire someone to shout at nearby beachgoers. But in *City of Ladue*, 512 U.S. at 54, and *Linmark*, 431 U.S. at 88, the Supreme Court rejected such alleged alternatives to signage as inadequate. They fail here too. *Alford*, 2017 WL 8785115, at *9. Yelling at or trying to talk to individual beachgoers about Daniels' Property or handing out leaflets to each person is not a reasonable alternative to an instrument, like signage, that conveys a consistent, readily observable and understandable message at the site. 512 U.S. at 56 ("a sign from one's own [property] often carries a message quite distinct from placing the same sign someplace else"); *see also Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 390 (6th Cir. 1996) (striking down a law banning yard signs in light of the ineffectiveness and burdens of alternatives). It is also preferable to warn beachgoers before they trespass then to ask them to leave after they have settled themselves on Daniels' Property.  Moreover, Town officials acknowledge that their policies foreclose other options for Daniels to communicate about the private character of his Property to beachgoers who might invade it. For instance, the Town Director of the Planning, Zoning, and Building Department (Wayne Bergman) testified that the Town Code bars all private signs on the beach area, SMF ¶ 57 (Bergman Depo. Tr. at 38:3-5), and that almost any fixed object that could host a message would qualify as a prohibited "structure" on the beach. SMF ¶ 57.

### C.  The Sign Ban Does Not Alleviate a Harm and Restricts Too Much Speech

Even if there are adequate alternative channels for speech, the Town's prohibition of the expressive posts and cones and signage must still be narrowly tailored to advance a significant state interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989). As to its interests, the government must show its speech restriction seeks to address a real public harm and that the restriction "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Solantic*, 410 F.3d at 1267. As to proper tailoring, the Town's speech restriction must not burden "more speech than is necessary." *Ward*, 491 U.S. at

798-99; *City of Ladue*, 512 U.S. at 55. The Town's prohibition of Daniels' posts and cones fails at both steps.

Here, the Town is likely to argue that Section 134-1472 of the Town Code serves aesthetic and safety interests in prohibiting Daniels' posts and cones and signs, but these interests are not particularly compelling ones on private property. *City of Ladue*, 512 U.S. at 58-59. In any case, the Town has not shown, and cannot show, that applying its ordinance to bar Daniels' expressive monoposts and cones serves such alleged interests. There is no evidence the monoposts or cones pose a danger to anyone. Indeed, the Town initially encouraged erection of the posts and cones without such concerns, and they were in place for a year and half without incident. SMF ¶¶ 33-36. Nor has the Town shown any persuasive aesthetic justification for its prohibition. Section 134-1472 of the Town Code does not bar all structures on the beach area for aesthetic reasons; it allows pools and seawalls. It is hard to see how aesthetics, safety or even access concerns justify a ban on small, moveable cones with signage when a seawall or pool can be built there.

The Town's prohibition of posts and cones with messaging on them also bans more speech than necessary. *See, e.g.*, *Alford*, 2017 WL 8785115, at *8; *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 951 (11th Cir. 2022); *Arlington Cnty. Republican Comm. v. Arlington Cnty.*, 983 F.2d 587, 594 (4th Cir. 1993). The Town could have potentially tried to limit the type, size, number, or timing of the posts and cones and signage that Daniels could use on his Property. Yet, its position is that all expressive cones or posts are prohibited "structures." *See* SMF ¶ 57 (Bergman Depo. Tr. at 34:2-9). As applied by the Town, Section 134-1472 of the Town Code bars almost all fixed mediums for speech on private beach property. *LaCroix*, 38 F.4th at 951; *City of Ladue*, 512 U.S. at 58-59. Indeed, the Town's prohibition of expressive posts and cones and related signage appears to prohibit more speech than the sign restrictions invalidated in *City of Ladue* and *Linmark*. Therefore, in addition to denying Daniels a channel to effectively communicate to beachgoers about his Property, the Town's broad application of Section 134-1472's limitations on "structures" to prohibit expressive posts or cones (or other fixed objects) sweeps away too much speech. *Cleveland Area Bd. of Realtors*, 88 F.3d at 388 ("[T]he wholesale ban on lawn signs . . . is, simply, not sufficiently narrowly tailored.").

## CONCLUSION

The Court should grant summary judgment to Plaintiffs on Counts I and III of the Complaint.

Dated: December 15, 2025.         Respectfully submitted,

                             /s/ Joseph P. Kenny

| | |
|---|---|
| J. David Breemer, *Pro Hac Vice* | Joseph P. Kenny, Esquire (FBN: 59996) |
| Cal. Bar No. 215039 | WEBER, CRABB & WEIN, P.A. |
| Pacific Legal Foundation | 5453 Central Avenue |
| 555 Capitol Mall, Suite 1290 | St. Petersburg, FL 33710 |
| Sacramento, CA 95814 | Telephone: (727) 828-9919 |
| Telephone: (916) 419-7111 | Facsimile: (727) 828-9924 |
| JBreemer@pacificlegal.org | Primary: joseph.kenny@webercrabb.com |
| | Secondary: suzie.whitaker@webercrabb.com |

ATTORNEYS FOR PLAINTIFFS