UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:25-cv-80368-DIMITROULEAS/REINHART

LESLIE B. DANIELS and 100
EVERGLADES, LLC,

        Plaintiffs,

v.

TOWN OF PALM BEACH, FLORIDA,

        Defendant.

_____/

## DEFENDANT TOWN OF PALM BEACH'S MOTION FOR SUMMARY JUDGMENT

    Defendant, Town of Palm Beach (the "Town"), moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment on the remaining claims[1] of Plaintiffs, Leslie Daniels ("Daniels") and 100 Everglades, LLC ("100 Everglades")—Count I for a Taking Under the Fourth and Fifteenth Amendments to the U.S. Constitution and Count III for Violation of First Amendment—and the Town's affirmative defenses of a Section 161.141, Fla. Stat. easement, common law customary use, statute of limitations, and false and inherently misleading speech.

## INTRODUCTION

    Since the 1950s, members of the public have regularly made traditional recreational use of the dry sand beach between Wells Road and Sunrise Avenue in the Town (the "Restored Beach"), including the Daniels Beach. Town witnesses have testified that the Restored Beach, known as the "dog beach" and visited by residents and non-residents alike, has always been open to the public. The Town Manager, who personally recreated on the beach in the 1990s, describes it as the third most popular beach behind the Town's municipal beach and a public park. The public recreated on the Restored Beach without opposition from Plaintiffs or anyone else—including the Town—for decades. Daniels did not even purchase his property until 2003, did not live in it "full-time" until 2011, and even after 2011 only spends five months a year here. When he was in Town, he would

---

[1] The Complaint also included procedural due process (Count II) and First Amendment retaliation (Count IV) claims that were dismissed on August 18, 2025. [D.E. 26].

allow residents of the Town to use the Daniels Beach. Only in 2019, after the Town requested a perpetual use easement required by the U.S. Army Corps of Engineers to renourish the beach with public funds, did Daniels and other beachfront property owners began to complain of more intense public use by non-residents and seek to exclude the public altogether. By that time, the public's common law customary use rights had long since accrued. Plaintiffs' property interest in the Daniels Beach had become subject to that customary use, which is an absolute defense to Plaintiffs' takings claim.

The Restored Beach is unique in that it has been renourished time and again—in 2003, 2006, 2015 and 2020—by the Town working with the state and the federal government. In other words, the Daniels Beach would not exist **but for** the public funding the additions of sand to his upland property. The Florida Legislature has, not surprisingly, legislated certain public rights to Florida's privately owned dry sand beaches in such circumstances. Under Section 161.141, Fla. Stat., the additions to upland property after a beach restoration/renourishment project are "subject" to a public easement for traditional uses  of the sandy beach consistent with uses allowed prior to the need for the restoration project. Where Plaintiffs and their predecessor-in-interest allowed the public to make traditional recreational use of the Daniels Beach prior to the 2003 restoration project (and each project thereafter), the property became "subject to" a public easement by operation of law years ago. No takings claim can arise under the circumstances.

Further, the Section 161.141 public easement arose more than two decades ago in 2003 and is barred by the four-year statute of limitations for Section 1983 claims. At the very latest, Daniels indisputably knew in 2019 about Section 161.141, that his dry sand beach had been renourished, and that he had been allowing the public to use it. He failed to bring this suit until spring 2025, after the limitations period ran. His takings claim is time barred.

Finally, the as-applied First Amendment claim fails where the public did, in fact, have the right to use the Daniels Beach. He is not entitled to any constitutional protection for marking the Daniels Beach with posts, cones and signs of "private property" and "no trespassing" where the public had recreational use rights. Such speech is contrary to law, false and misleading.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party's burden may be met "by demonstrating that there is a lack of evidence to support

the essential elements that the non-moving party must prove at trial." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). A court must decide whether the parties' evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248–49.[2] A mere "scintilla of evidence in support of the [nonmovant's] position," is insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252.

### THE CONSTITUTIONAL, STATUTORY, AND COMMON LAW PROTECTIONS GIVEN FLORIDA BEACHES

**A.      The Public's Rights to Enjoy Florida Beaches**

"In addressing property disputes, Florida courts have long recognized the unique nature of its beaches." *Buending v. Town of Redington Beach*, 10 F.4th 1125 (11th Cir. 2021). The Florida Supreme Court has stated:

> We recognize the propriety of protecting the public interest in, and right to utilization of, the beaches and oceans of the State of Florida. No part of Florida is more exclusively hers, nor more properly utilized by her people than her beaches. And the right of the public of access to, and enjoyment of, Florida's oceans and beaches has long been recognized by this Court.

*City of Daytona Beach v. Tona-Rama, Inc.*, 294 So. 2d 73, 75 (Fla. 1974). These public use rights to Florida's beaches arise under the Florida Constitution, the common law, and Florida statutes.

The Florida Constitution obligates the State to conserve and protect Florida's beaches as important natural resources, part of which it holds "in trust for all the people." Art. X, § 11, Fla. Const. It gives the public a right of access along the beaches and shorelines, below the mean high water line in the area known as the wet sand beach. *See id. See al*so Fla. Stat. § 187.201(8)(b)(2) (adopting as part of the State Comprehensive Plan to "[e]nsure the public's right to reasonable access to beaches"). The Florida Supreme Court has recognized:

> There is probably no custom more universal, more natural or more ancient, on the sea-coasts, not only of the United States, but of the world, than that of bathing in the salt waters of the ocean and the enjoyment of the wholesome recreation incident thereto. The lure of the ocean is universal; to battle with its refreshing breakers a delight. Many are they who have felt the lifegiving touch of its healing waters and its clear dust-free air… The people of Florida—a State blessed with probably the

---

[2] All emphasis is added unless otherwise indicated.

finest bathing beaches in the world—are no exception to the rule… The constant enjoyment of this privilege of thus using the ocean and its fore-shore for ages without dispute should prove sufficient to establish it as an American common law right.

*White v. Hughes*, 190 So. 446, 448 (Fla. 1939).

As the Eleventh Circuit recently noted, "Florida law [also] allows for localities to recognize the public's customary use of their beaches, with Florida courts invoking the English common law tradition of the doctrine." *Buending*, 10 F.4th at 1128. Customary use does not create any property in the interest in the land itself but recognizes the use of another's property based on longstanding customs. *See id.* at 1128-29 (quoting *Tona-Rama*, 294 So. 2d at 78).

"The Florida Supreme Court first articulated the customary use doctrine in 1974." *Id.* at 1132 (citing *Tona-Rama*, 294 So. 2d at 78). The right of customary use permits the "general public [to] continue to use the dry sand area for their usual recreational activities, ***not*** because the public has any interest in the land itself, but because of a right gained through custom to use this particular area of the beach as they have without dispute and without interruption for many years." *Tona-Rama*, 294 So. 2d at 78. "If the recreational use of the sandy area adjacent to mean high tide has been ***ancient, reasonable, without interruption and free from dispute***, such use, as a matter of custom, should not be interfered with by the owner." *Id.*

"The Florida courts of appeal have also written on the doctrine." *Buending*, 10 F.4th at 1132. The Fifth District in *Reynolds v. County of Volusia* noted that "the doctrine of customary usage of the sandy beach areas of this state offer[ed] a potential… ground" to affirm the ruling that there was no taking of private property. 659 So. 2d 1186, 1190-91 (Fla. 5th DCA 1995).[3] The doctrine "requires the courts to ascertain in each case the degree of customary and ancient use the beach has been subjected to and, in addition, to balance whether the proposed use of the land by the fee owners will interfere with such use enjoyed by the public in the past." *Id.* at 1190.

**B.      Public and Private Rights on Publicly-Financed Beach Restoration Projects.**

In 1961, Florida passed the Beach and Shore Preservation Act (the "Act") to protect the State's beaches and shorelines, as well as upland property. Fla. Stat. §§ 161.011, *et seq.*  The core

---

[3] Because the owner's title was determined to not include the dry sand beach, *Reynolds* did not ultimately reach the customary use issue. *See id.* at 1190-91.

provisions- were enacted in 1970. 1970 Fla. Laws, ch. 70-276 § 1 (codified, in substantial part, at Fla. Stat. §161.088). The stated purposes for the Act include:

> Whereas, proper nourishment and restoration of badly eroded beaches requires the financial support of both the State and Federal governments; and

> Whereas, the necessary amounts of public funds cannot be authorized or expended to replenish eroded beaches unless ***the right of the public to the use and enjoyment of the restored beaches be preserved***.

1970 Fla. Laws, ch. 70-276, Comm. Subst. HB 15. The Act "shall be **liberally construed**" "to best accomplish the beach and shore preservation purposes and programs." Fla. Stat. § 161.131.

The Act authorizes state and local governments to undertake "'beach restoration and nourishment projects,' § 161.088, designed to deposit sand on eroded beaches (restoration) and to maintain the deposited sand (nourishment)." *Stop the Beach Renourishment, Inc. v. Fla. Dep't Env't Prot.*, 560 U.S. 702, 709, 130 S. Ct. 2592 (2010). A local government may apply to the Florida Department of Environmental Protection ("FDEP") for approval and funds to restore a beach deemed "critically eroded." Fla. Stat. §§ 161.161(1), 161.101(1), 161.041(1). The Board of Trustees of the Internal Improvement Trust Fund ("Board"), which holds title to the State's submerged lands, must authorize the placement of fill on those lands. Fla. Stat. §§ 161.161(5), (6).

Benefits for upland property owners: Because a beach restoration/nourishment project advances the shoreline position seaward, the State requires the establishment of an "erosion control line" ("ECL") to delineate the property boundary following project construction. Fla. Stat. §§ 161.161(3)-(5); SOF 14.[4] On an un-nourished beach, the property boundary would be defined by the mean high-water (MHW) location. *Id.* The fixed ECL replaces the fluctuating MHWL as the boundary between the State's lands and the privately owned uplands. *Id.;* Fla. Stat. § 161.191(1). It is generally set by reference to the then-existing mean-high-water line ("MHWL"), which otherwise serves as the dividing line between upland coastal property and the submerged lands owned by the State. Fla. Stat. §§ 161.161(6); 177.27(14)-(15); 177.28(1).

Sand placement can proceed only **<u>after</u>** an ECL is fixed. Fla. Stat. § 161.141; SOF 43. Additions to the upland property landward of the ECL that result from a beach restoration project become the property of the upland owner. Fla. Stat. § 161.141. With limited exceptions, common law then no longer operates to increase or decrease the proportions of any upland property, either

---

[4] "SOF" refers to the Town's Statement of Undisputed Material Facts, filed contemporaneously.

by accretion, erosion, or any other natural or artificial process. Fla. Stat. § 161.191(2). The fixing of the ECL thus protects upland owners from the loss of property due to future erosion. *See id.; Stop Beach Renourishment*, 998 So. 2d at 1116.

Protections for the public—the statutory public easement: Since 1982, Section 161.141 of the Act has also recognized certain public rights following a renourishment project. The 1982 amendment added: "Such resulting additions to upland property shall also be ***subject to a public easement*** for traditional uses of the sandy beach consistent with uses which would have been allowed prior to the need for such nourishment project." The related Senate Staff Analysis and Economic Impact Statement (revision dated Jan. 26, 1982) for SB 255 explained:

> Upland created through beach nourishment becomes property of the upland owner, but remains subject to all governmental regulations. … ***Most important, additions to upland are*** <u>***subject to a public easement for use as a beach***</u>***. The upland owner would*** <u>***not***</u> ***be able to exclude the general public*** from beach created through publicly financed restoration.

Since 2000, Section 161.141 provides:

> … any additions to the upland property landward of the established line of mean high water which result from the restoration project remain the property of the upland owner… ***The resulting additions to the upland property are also*** <u>***subject to a public easement for traditional uses of the sandy beach***</u> ***consistent with uses that would have been allowed prior to the need for the restoration project***.

Fla. Stat. § 161.141 (emphasis added).

## ARGUMENT

## I. PLAINTIFF'S TAKINGS CLAIM (COUNT I) FAILS ON THE MERITS

Plaintiffs claim that the Town's (1) recognition of a Section 161.141 statutory easement for traditional, public recreational beach uses;  (2) refusal to trespass members of the public based on the existence of that easement; and (3) zoning code prohibition of structures that prevented Plaintiffs from posting the Daniels Beach to prevent members of the public from recreating, "constitute[] an unlawful taking of Plaintiffs' private property without paying just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution." Compl. ¶ 62. Plaintiffs claim the Town has "deprived [them] of the fundamental right to exclude others," eliminating "all viable use and enjoyment of that private property." *Id*. ¶¶ 63-65.

The Town acknowledges that government-authorized permanent physical occupation of an owner's property, however minor, is a *per se* taking. *See Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 440 (1982). A *per se* physical taking may be found where "the government

gives third parties 'a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed.'" *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942 (11th Cir. 2018) (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 832 (1987)).  Here, the first alleged act of taking—the recognition of a public easement under Section 161.141—arose by operation of law when the ECL was fixed and the Town added sand to the Daniels Beach in 2003 after the public had been allowed to make traditional recreational use of that beach for years. The Town's mere assertion of "a pre-existing limitation upon the land owner's title" does not amount to a taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1028–1029 (1992). Neither does its police and zoning code enforcement decisions. The alleged acts of taking neither separately nor together effect a government-authorized permanent physical invasion.

A.     **The Town is Entitled to Judgment on its Section 161.141 Defense**

The Town did not take Plaintiffs' property merely by recognizing that a public easement arose by operation of Section 161.141 **in 2003** after the Daniels Beach—which had received the benefit of a fixed ECL that added property in 2002—was renourished with public funds that advanced Plaintiffs' dry sand beach area by more than 75 feet in 2003. SOF 38, 46. Plaintiffs' predecessor-in-interest ("predecessor") allowed the public to make traditional use of the Daniels Beach prior to the need for that 2003 renourishment and Plaintiffs thereafter continued to allow public recreational use of the Daniels Beach prior to the need for the 2006, 2015 and 2020 nourishment projects. SOF 6, 11-35. No takings claim could have arisen in 2021 where the public had already acquired a pre-existing, statutory easement for traditional uses of the Daniels Beach.

It is undisputed that the entire Daniels Beach benefited from "additions to [private] upland" in 2003 and, thereafter, in 2006, 2015 and 2020. The Town's expert coastal engineer and Engineer of Record, observed construction of the Restored Beach and placement of sand from the seawall east well into the water in 2003. SOF 49; ECF [51-1] ¶30. There was only a nominal beach at the Daniels Beach just prior to the 2003 project; at conclusion, the dry sand beach extended out more than 150 feet. SOF 39-40, 49. The Town again placed sand on the Daniels Beach from the seawall east into the water in 2006 and 2015. SOF 52, 57. After the Town constructed a dune in 2016, sand was placed from the toe of the dune into the water in 2020. SOF 59, 69-70. Sand placed during the past two decades refilled the same design template originally authorized in 2002 by FDEP Permit/Authorization No. 0164713-001-JC. ECF [51-1] ¶ 29. Daniels does not dispute that he

7

received the benefit of this additional sand; he **never** expended any of his funds to renourish the Daniels Beach. SOF 38.

It is further undisputed that Daniels' predecessors "allowed" the public to engage in traditional recreational uses of the Daniels Beach prior to the need for the renourishment in 2003. From 1970 to approximately 2015, Helen Tracy "had a regular beach party" every weekend and holiday with neighbors, like the O'Hara family, and friends from West Palm Beach. SOF 14-19; ECF [48-8] at 15:9-16:5. For nearly sixty (60) years, Timothy O'Hara has accessed the Restored Beach through the Everglade Beach Access and has recreated on the Daniels Beach with his grandparents, parents, children, and grandchildren. SOF ¶¶ 12-13. Since 1985, Richard Wentley has "practically lived on the Restored Beach"—surfing, exercising, picnicking, and generally recreating almost every day. SOF 23-29. When Wentley opened his surf shop in 1993, he began offering "surf lessons, surf etiquette clinics, and surf birthday parties on the Restored Beach" and specifically recalls  "frequently leave[ing] paddleboards and surfboards at the ungated Everglade Beach Access for families, like the O'Hara's." SOF 28. Daniels has no knowledge and cannot dispute the uses allowed on the Daniels Beach prior to the first nourishment in 2003. SOF 1, 4.

Even after purchasing the property in 2004, Daniels continued to allow the public to recreate on the Daniels Beach until as late as 2020. SOF 37, 72. Daniels observed members of the public, including people living in the neighborhood, utilizing the Everglades Beach Access and the Daniels Beach. SOF 37. Indeed, Christoper Twardy has recreated on the Restored Beach since 2001, and he consistently observes the public sunbathing and recreating on the Daniels Beach. SOF 32. In 2020, Mr. Twardy moved to Everglade Avenue and now "typically plant[s] a chair to the south of the Everglade Access on the Daniels Beach," because "trees located near the Everglade Access often cast shadows over the beach area to the north." SOF 33. Even after gating the Everglade Beach Access in 2020, Daniels provides the gate combination to residents of the Town. SOF ¶ 9; ECF [48-4] at 95:7-10 ("I have said that if another neighbor wants the combination, you can give it to them, but please don't give it to anyone that doesn't live here.").

Not surprisingly given its recognition of the right to preserve the public's right to use and enjoy critically eroded beaches that are restored using public funds, the Legislature by Section 161.141 has ensured that the public will not lose the right to use restored/renourished beaches when those public taxpayers pay to save private upland property by adding sand. As the Supreme Court explained in *Lucas*, the government does not take a property interest when it merely asserts

a "pre-existing limitation upon the land owner's title." 505 U.S. at 1028–1029. Indeed, courts have long recognized that no taking occurs where the government merely enforces or recognizes an already existing burden or right on the land. *See, e.g., Cedar Point Nursery v. Hassid,* 594 U.S. 139, 160 (2021) ("[M]any government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights."); *Lucas,* 505 U.S. at 1028-29 ("[W]e assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the land owner's title"). The Town's recognition of the pre-existing (since 2003) public easement for traditional beach uses under Section 161.141 did not result in a *per se* physical taking of the Daniels Beach.

B.      **The Town is Entitled to Judgment on its Customary Use Defense**

The Restored Beach, which includes Daniels Beach, has been utilized by members of the public for recreational purposes throughout the Town's history. The "public" includes Town residents and non-residents. The public's immemorial use of the Restored Beach includes sunbathing, picnicking, sandcastle building, playing sports, and other traditional beach uses.

As the Eleventh Circuit observed in *Buending*, while the beachfront property owners purchased their properties for substantial sums, the "[o]wners, of course, made these purchases against the backdrop of state property law principles." 10 F.4th at 1128. That includes customary use as followed in Florida law. *See id.* at 1131. The doctrine of customary use does not impose an adversity requirement, and the doctrine applies **even where** the owner has given actual or implicit permission. *Id.* (contrasting prescriptive easement). While the public may abandon this right, the owner **cannot** revoke it. *Tona-Rama*, 294 So. 2d at 78.

The Eleventh Circuit recently evaluated customary use as an affirmative defense to a regulatory takings claim regarding privately owned beach parcels in *Buending*. Of note, the beach at issue had **not** been renourished and, therefore, the takings claim was not premised on a Section 161.141 easement. Instead, Redington Beach had adopted a customary use ordinance pursuant to now repealed Fla. Stat. § 163.035.[5] 10 F.4th at 1129. The Court reversed the District Court's finding

---

[5] In 2018, the Florida Legislature adopted Florida Statute § 163.035 and created a complex procedure for adopting or keeping an ordinance that found or relied on recreational customary use above the MHWL. That statute was repealed in 2025, making it **easier** for local governments to adopt such an ordinance and shifting the burden to property owners to demonstrate the public does **not** have customary use rights over their privately-owned beaches. Fla. HB 6043, SB 1622. Local governments are allowed, "but not require[d]" to adopt an ordinance, HB 6043 Bill Analysis,

that the Town failed to prove its affirmative defense at the summary judgment stage, because the Town presented competent evidence in support of its defense "suggesting that residents and nonresidents alike use the dry sand beaches, including residents who do not own beachfront property." 10 F. 4th at 1134. Evidence presented by Redington Beach included (1) the existence of public beach accesses in the particular beach area; (2) the expenditure of Town funds to maintain the beach; (3) the occurrence of public events, such as beach clean-ups on the beach; (4) resident testimony and photographs supporting the longstanding perception that the beach was available for public use; and (5) plaintiff testimony acknowledging public use of the beach. *See id.* at 1133.

The Town offers similar evidence to Redington Beach: (1) the existence of public beach accesses along the Restored Beach; (2) the expenditure of public funds to restore and maintain the Restored Beach; (3) the occurrence of public beach clean ups on the Restored Beach; (4) testimony from nearly a dozen current and former Town residents, who do not own oceanfront beach parcels, regarding the public's historic and consistent use of the Restored Beach for recreational activities; (5) photographic evidence of public recreation occurring on the Restored Beach; and (6) Plaintiffs' testimony acknowledging public, recreational use of the Restored Beach.

To establish customary use, the Town need not prove customary use of Daniels' Beach specifically but that "**the general area of the beach** where [Plaintiffs'] property is located has customarily been put to [recreational] use and that the extent of such customary use on private property is consistent with the public's claim of right." *Trepanier v. Cnty. of Volusia*, 965 So. 2d 276, 290 (Fla. 5th DCA 2007); *accord Buending*, 10 F.4th at 1134. The Daniels Beach is within the "fairly limited stretches of beachfront" that is the .4 mile Restored Beach. SOF ¶ 3. For the following reasons, the public's recreational use of that Restored Beach is (1) ancient; (2) reasonable; (3) without interruption; and (4) free from dispute. *Tona-Rama, Inc.*, 294 So. 2d at 78.

### 1. The Public's Use of the Restored Beach Is Ancient.

The Restored Beach has been used by the public for recreational purposes for over 70 years, a time period far more than sufficient to establish ancient use.

In *Tona-Rama*, the Court found that the public's recreational use of a private beach area qualified as "ancient" when the public's use spanned for "many years," "over a period of several

---

available at https://www.flsenate.gov/Session/Bill/2025/6043/Analyses/h6043c.NRD.PDF; as noted, customary use arises under the common law.

decades," and "untold decades."  294 So. 2d at 76, 77, 78. *Trepanier* observed that the term "ancient" is "an awkward concept in a new world society." 965 So. 2d at 293 n.22. Although Florida courts have not defined "ancient," "guidance exists in the period reviewed in *Tona-Rama.*" *Buending v. Town of Redington Beach*, No. 8:19-CV-1473-VMC-SPF, 2024 WL 3755807, at *11 (M.D. Fla. Aug. 12, 2024).  The record in *Tona-Rama* evidenced **just over 20 years** of public use, therefore, "in later deciding that the defendant had succeeded on its customary use defense, the Florida Supreme Court necessarily determined that the evidence of the past twenty years sufficiently proved the "ancient" requirement. *Id.*

As far back as living memory permits, since 1950 at least, Town residents and non-residents have recreationally used the Restored Beach. SOF 6-7. Town residents like David Reese, Helen Tracy (age 96), Timothy O'Hara (age 75), and Michael Pucillo (72 years) attest to this longstanding public use of the entire Restored Beach. SOF 11-22. Town resident David Reese visited his parents on Dunbar Road from 1950 (and then lived there from 1957-1967), using what was then a narrow beach "every day." SOF 11; ECF [48-6] at 13:4-17:4. Mr. O'Hara grew up in the neighborhood using the beach from 1954-1967 and returned to use it "almost every weekend" during college in the late 1960s/early 1970s. SOF 12. He has used the Restored Beach with generations of his family for over 60 years and has observed other members of the public doing the same. SOF 13. Ms. Tracy began using the Restored Beach in 1966 and used it consistently with friends until 5 or 10 years ago. SOF 16-17. Former Town Council President Pucillo has lived at 224 Dunbar Road and regularly used the Restored Beach since 1995, including with his young family in the 1990s and early 2000s. SOF 20-22.

The Town's witnesses understood the Restored Beach to be a "public beach," even though it was not a municipal beach. SOF 7, 11, 19, 36. Town Manager and former resident Kirk Blouin regularly used the Restored Beach in the 1990s, and describes it as one of ***"[t]he [three] most used beaches in Town***." SOF 30-31. He personally used "that entire beach area" between Sunrise and Wells in the 1990s. SOF 30. Captain Rothrock agreed that the Restored Beach had one of the "highest concentrations of people" when he did regular ATV beach patrols from 2007 to 2015. SOF 35; ECF [48-7] at 12:10-14:5. And Captain Guelli described the beach as "always [] open to the public," "very populated," and "very popular." SOF 36. In fact, the Restored Beach has "always been known as a popular dog beach," "consistently used by members of the public from the Town, West Palm [Beach], and other nearby areas for dog related activities" since dogs are not allowed

on the municipal beaches. SOF 7, 36; ECF [49-4] ¶ 6; ECF [48-5] at 10:7-9, 19:8-25. Non-residents Christopher Twardy, Richard Wentley, and Thomas Warnke confirmed their public use. SOF 23-29, 32-34; ECF [49-6]. Mr. Wentley observed that guests of a hotel located a quarter-mile from the Restored Beach would regularly use it. SOF 23.

The Town's evidence of ancient customary use is undisputed. Where the use began in 1950, customary use had already arisen by the time Plaintiffs purchased their Property in 2004. They certainly cannot refute public use prior to that time. Even after 2004, Daniels concedes that the public continued to use the Restored Beach. That he invited or allowed certain members of the public does not stop customary use from arising. *See Buending*, 10 F.4th at 1134 (reversing where district court "dismissed evidence showing public use simply because the beachgoers could have been 'invitees of the property owners'").

### 2. The Public's Use of the Restored Beach Is Reasonable.

The public's recreational use of the Restored Beach has traditionally included sunbathing, sandcastle building, picnicking, playing sports, dog walking, and other similar activities related to enjoyment of the beach. SOF 6, 17-18, 22-24. These uses are integral to spending time at the beach, and the evidence suggests that such activities have always been public uses at the Restored Beach. No use of the Restored Beach could be more reasonable than sunbathing or similarly enjoying the sun and sand. *See White*, 190 So. at 448.

Daniels complains that the Town refused to enforce trespass in 2019, when too many people—who were not Town residents—engaged in traditional recreational uses of the Restored Beach in or after 2019. SOF 72. Yet the issue for customary use is the nature of the public use, not the intensity of it. For these reasons, this Court should find that the Town's actions in permitting public recreational activities, such as sunbathing, sandcastle building, picnicking, playing sports, dog walking, and other similar activities, are reasonable uses of the Daniels Beach.

### 3. The Public's Use of the Restored Beach Is Without Interruption and Has Never Been Abandoned.

Public use of the Restored Beach began over 70 years ago and has continued through the present without interruption. In 2019, Daniels became upset by increased public use of the Restored Beach by non-residents. SOF 72. At his request, the Town attempted to regulate the Restored Beach by adopting ordinances and issuing trespass warnings for the first time. SOF 73-76. Although the Town reduced the intensity of public recreation, the public did not stop recreating in the area entirely. SOF 81. The public never abandoned use of the area.

### 4.   The Public's Use of the Restored Beach Is Free from Dispute.

The public's decades-long recreational use of the Restored Beach was never disputed by Plaintiffs, their predecessors-in-interest, or other beachfront property owners prior to Spring of 2019. SOF 72; ECF [49-1] ¶¶ 19-20; [49-2] ¶¶ 9-10; [49-3] ¶¶ 18, 20; [49-4] ¶ 15; [49-5] ¶¶ 13, 15; [49-6] ¶¶ 14-15; [49-7] ¶¶ 14, 20. Even Daniels, who was not a full-time Florida resident until 2011 and since then only usually spends January to May at the Property, had allowed Town residents to use the Daniels Beach for many years. SOF 4-5, 37.

Daniels' complaints to the Town about public use beginning in or about 2019 cannot terminate or revoke that long-established public recreational use. As the Eleventh Circuit held in *Buending*, customary use "does not impose an adversity requirement" and "applies even where the owner has given actual or implicit permission." 10 F.4th at 1134 (citing *Tona-Rama*, 294 So. 2d at 76, 78). On remand, the district court thus properly credited Town witnesses who "established that until certain Plaintiffs confronted some town residents to 'get off their land'… the use of the beach was free from dispute." *Buending*, 2024 WL 3755807, at *15.

### C.   Regardless of the Public's Rights of Use, No Other Act by the Town Constituted a Taking.

Where the public had acquired rights to traditional recreational use of the Daniels Beach, through either their Section 161.141 easement or common law customary use, the Town's refusal to enforce trespass against such public activities and its affirmative enforcement of the zoning code to prohibit Daniels from posting his property to stop the public from exercising those rights can constitute a taking. The Daniels Beach has been subject to these public use rights for decades. But regardless of whether the public had acquired those use rights, discretionary police and Zoning Code enforcement do not constitute a physical taking of property.

### 1.   The Town's Discretionary Trespass Decision Did Not Effect a Taking.

Plaintiffs allege the Town's refusal to enforce trespass against members of the public recreating on the Daniels Beach has resulted in a government-authorized public invasion of the property. *See* Compl. ¶ 62. The decision to make an arrest for the violation of law is a discretionary one left to the law enforcement officer. *See Everton v. Willard*, 468 So. 2d 936, 938 (Fla. 1985). "This discretionary power is considered basic to the police power function of governmental entities and is recognized as critical to a law enforcement officer's ability to carry out his duties." *Id.*

While Plaintiffs first asserted **exclusive** rights to the Daniels Beach in or about 2020 (after refusing to grant the easement required by the federal government), the Town's legal counsel advised it in October 2021 that a "strong argument" exists that the public has traditional use rights pursuant to Florida law. SOF 72, 77-82. Under the circumstances, the Town did and does not even have probable cause to cite or enforce trespass on the Daniels Beach.[6]

*Chmielewski* illustrates the inability to base a taking claim on discretionary decisions to not enforce trespass  As discussed more fully *infra*, in *Chmielewski* the city engaged in numerous acts that openly and blatantly encouraged the public to use a privately owned beach that the city previously agreed in writing was private. 890 F.3d at 950. In affirming the finding of taking, the Eleventh Circuit observed the City had also declined to enforce trespass laws against the public using the beach parcel. *See id.* at 947. But the decision to not enforce trespass laws was **not** one of the actions the court listed as "City's Actions Encouraged Use of Beach Parcel" that "resulted in frequent public use of the beach parcel." *Id.* at 950. In other words, the lack of enforcement of trespass—even on property that was indisputably private—was a non-factor in the takings analysis.

The discretionary decision to not enforce trespass on the Daniels Beach, where the public may have easement and/or customary use rights, does not constitute a taking under any standard.

### 2.  The Town's Enforcement of its Zoning Code Did Not Effect a Taking.

The Town's Zoning Code, specifically Sections 134-2(a) and 134-1472, prohibits certain structures in the Beach Area District, which encompasses the Renourished Beach. *See* Town Code[7] § 134-2(a) ("[O]nly those uses and structures which are specifically permitted in the Code of Ordinances are allowed. If there is no specific language in the Code which addresses a use or a structure, then said use or structure is not permitted."), § 134-1472 (delineating the exclusive list

---

[6] "[A] police officer does not have the discretionary authority to arrest a citizen whom the officer does not have probable cause to believe has committed an offense." 24A Fla. Jur 2d False Imprisonment § 8. Further, "there is no sovereign immunity for false arrest." *Id.* Fla. Stat. § 768.28(1) (waiving sovereign immunity or negligent or wrongful acts or omissions of employees acting within scope of office or employment). As a result, if a Town police officer makes an unauthorized arrest, he or she becomes subject to civil liability for false arrest and so does the Town as the employing agency. 14 Fla. Jur 2d Criminal Law—Procedure § 155; *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1122 (Fla. 4th DCA 1987).

[7] The Town's Code of Ordinances is publicly available at
https://library.municode.com/fl/palm_beach/codes/code_of_ordinances.

of permitted uses and structures in Beach Area District). Plaintiffs claim that the Town's enforcement of its Code, which precludes Plaintiffs from marking the Daniels Beach with monoposts, amounts to a taking by a government-authorized physical invasion. Compl. ¶64. Yet zoning regulations are a permissible exercise of police power. *See Murr v. Wisconsin*, 582 U.S. 383, 400 (2017)(recognizing that reasonable land-use regulations do not work a taking). The Town's enforcement of the Zoning Code's prohibition of posts and plastic cones on the Daniels Beach does not support a *per se* physical taking as a matter of law.

**D.      No Collective Actions by the Town Effected a Taking.**

Plaintiffs allege that the Town's recognition of public use, discretionary police power decisions, and enforcement of its zoning code collectively constitute a physical invasion of the Daniels Beach. Compl. ¶62. They do not, whether taken individually or collectively.

*Chmielewski* exemplifies collective conduct by a governmental entity that may rise to the level of a physical invasion taking. In *Chmielewski*, owners of beachfront property sued the City of St. Pete Beach ("City") claiming a taking of beachfront property. 890 F.3d at 945. Initially, the City agreed in writing with the property owners that the public did not have a right to use the private beach property. *See id.* Disregarding the agreement, the City encouraged public use of the beach property by clearing a direct public access path; placing large "Beach Access" signs with the City's emblem;  constructing "convenient public parking to facilitate beach access;" clearing and improving a neighboring parking lot; installing parking meters within half a block; publicly announcing the availability of public parking; and building an adjacent community center. *See id.* at 946. In addition, the City zoned the subject beach property as "recreation open space/public park" and hosted public events on the private beach parcels, including flea markets, weddings, holiday celebrations, and the mayor's charity wiffle ball tournament with hundreds in attendance. *Id.* at 946, 950. Sufficient evidence showed the public's continuous trespassing and occupation of the beach property was "the natural and intended effect of the City's actions." *Id.*

Daniels concedes that the Town did not take any acts to promote public use of the Daniels Beach that approximate the extreme circumstances in *Chmielewski*. SOF 74-75, 84. The facts here more closely align with those in *Golf Village North, LLC v. City of Powell*, Ohio, 14 F.4th 611 (6th Cir. 2021). In affirming the grant of the city's motion to dismiss a takings claim, the Sixth Circuit held that "**unlike** in *Chmieleswki*, there is no allegation that the City actively encouraged members of the public to use the Golf Village's private roads or prevented Golf Village from

excluding the public from [private] Market and Moreland Streets." *Id.* at 622. Similarly here, Plaintiffs can offer no proof that the Town "actively encouraged" the public to use the Daniels Beach.

## II. THE TAKINGS CLAIM IS BARRED BY THE FOUR-YEAR STATUTE OF LIMITATIONS.

Plaintiffs first filed their claims on March 20, 2025. The takings claim presupposes that the public does not have use rights on the Daniels Beach. In denying the Town's motion to dismiss the takings claim, the Honorable Judge Rosenberg recognized this threshold issue but concluded that there were fact questions and accompanying applications of law "required to determine whether Section 161.141 created a pre-existing public easement." [DE 26 at 18-19] Now, with a complete record, judgment as a matter of law is appropriate because it is undisputed that Plaintiffs knew or should have known that Section 161.141 imposed an easement in favor of the public following the nourishment projects in 2003, 2006, 2015 and 2020. Accordingly, the takings claim is barred by the four-year statute of limitations.

Constitutional claims brought under § 1983 are tort claims subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought. *See Wilson v. Garcia*, 471 U.S. 261, 275–76 (1985). For any claims that accrued prior to March 24, 2023,[8] Florida's personal injury limitations period is four (4) years. *See Baker v. Gulf & W. Indus., Inc.*, 850 F.2d 1480, 1482 (11th Cir. 1988) (citing Fla. Stat. § 95.11(3)). Federal law determines when a Section 1983 action accrues. *See Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 588 (11th Cir. 1990). "A federal claim is generally considered to accrue when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (citation omitted).

The Restored Beach, which includes the Daniels Beach, has been restored and renourished on multiple occasions since 2003. Those projects followed the setting of an ECL in 2002 in accordance with Section 161.141, including public notices and hearings. SOF 41-46. The Daniels Beach was renourished—with the Town adding dry sand to Plaintiffs' upland property in 2003, 2006, 2015 and 2020 as part of the Mid-Town Renourishment Project. SOF 49, 52, 57, 69. For decades before and after the original project in 2003, the public made traditional use of the Daniels Beach without any intervention by the Town or complaints by Plaintiffs. SOF 6-7, 11-37, 40, 50,

---

[8] Effective March 24, 2023, the statute of limitations for personal injury actions is two years. Fla. Stat. § 95.11(5)(a); H.B. 837 (eff. 3/24/23).

53, 58, 71. Plaintiffs' failure to bring a claim asserting the Town took the Daniels Beach by recognizing the public's pre-existing right to use the beach until after the 4-year statute of limitations ran—under any scenario—bars Plaintiffs' claim.

**A.      Plaintiffs Knew or Should Have Known the Public Had a Statutory Easement Under Section 161.141 by No Later Than 2006.**

As early as 2002, Plaintiffs' predecessor knew or had reason to know the public had traditional beach use rights on the Daniels Beach. The public easement provision in Section 161.141 became Florida law more than 20 years before the 2002 setting of the ECL on the Daniels Beach under the Act and Section 161.141. Plaintiffs and their predecessor are charged with knowledge of the laws. *Rosner v. Sec'y of Health, Ed. & Welfare*, 306 F. Supp. 853, 855 (S.D. Fla. 1970) ("Parties dealing with the Government are charged with knowledge of and are bound by statutes and lawfully promulgated regulations despite reliance to their pecuniary detriment upon incorrect information received from government agents or employees.").

Plaintiffs' predecessor knew or should have known of the public's easement under Section 161.141 for additional reasons. The ECL was established on the Daniels Beach after a **publicly noticed** hearing in which any interested persons could "submit their views concerning the precise location of the proposed erosion control line." SOF 43-44; Fla. Stat. §§ 161.161(5), 161.181. The location of the ECL was publicly recorded. SOF 45. Plaintiffs' predecessor-in-interest **facilitated** the additions of upland property to the Daniels Beach by granting a temporary construction easement for the project in 2003. SOF 47. Moreover, they knew that the Daniels Beach was eroded prior to the 2003 project, but then enjoyed the extension of a dry sand beach out 150 feet from the seawall, well beyond the new ECL that extended their property line out 75 feet. SOF 39-40, 46, 49. Further, the undisputed testimony shows that the public was allowed to use the Daniels Beach for recreational purposes prior to 2003, as set forth above. Notably, there is no evidence that Plaintiffs' predecessor complained about the public's use of the Daniels Beach after the 2003 project. Plaintiffs' predecessor knew or should have known that the public's easement under Section 161.141 was triggered and no trespass was being enforced. At that point, if Plaintiffs are correct about the lack of public use rights, a takings claimed had accrued.

Plaintiffs are bound by their predecessor's knowledge concerning the public's easement under Section 161.141. *See e.g., Daniel v. County of Santa Barbara*, 288 F.3d 375, 383 (9th Cir. 2002) ("Under established federal law, a taking occurs when an option to take an easement is granted, not when the option is exercised. . . . [A] landowner who purchased land after an alleged

taking cannot avail himself of the Just Compensation Clause because… [t]he price paid for the property presumably reflected the market value of the property minus the interests taken."). But even if they are not, Plaintiffs knew or should have known of the public's easement rights by no later than 2006. Plaintiffs took title in 2004 after the 2003 project. SOF 1. Like their predecessor, Plaintiffs are charged with knowledge of the laws, *Rosner*, 306 F. Supp. at 855, and the publicly recorded location of the ECL. *Levy v. U.S.*, 10 Cl.Ct. 602, n.14 (1986) ("A purchaser has constructive knowledge of all information in the land records concerning the property he is purchasing."). Plaintiffs are also charged with knowledge of the publicly recorded easement granted by their predecessor to the Town which bound Plaintiffs to allow construction of future renourishment projects. *See id.* As a result, when hurricanes eroded the beach in 2004, the Town once again placed sand on the Daniels Beach to extend the dry sand beach out to the ECL and beyond in 2006. SOF 51-52. Leading up to the 2006 project, the public continued to use the entire Restored Beach, including the Daniels Beach, for traditional beach uses without complaints of trespass from Daniels, whose primary residence was in Connecticut from 2004 to 2011. SOF 4, 50. Accordingly, Plaintiffs knew or should have known that the public had a statutory easement by 2006, that the public was using the beach and that no trespass was being enforced. Accordingly, Plaintiffs claims are time barred.

> **B.     Daniels' Takings Claim Accrued by 2015.**

At a minimum, Plaintiffs knew or should have known the public had use rights by 2015.

In 2015, the ECL was extended north and south from the 2006 project. SOF 54. As required by statute, the extension of the ECL required public notice and hearing. *Id*. On October 9, 2014, the Town held a public workshop and FDEP held a public hearing on the proposed extensions of the ECL. SOF 55. Dr. Jenkins, the engineer-of-record for the 2003 and 2015 project, presented at both hearings and during the 2014 workshop he explained the effect of Section 161.141, including the public easement:

> It's also in the statute that new beach is subject—and this is a direct quote—subject to a public easement for traditional uses of the sandy beach. That new beach is beach. It's in common, it's beach… It is held in common as a beach and has traditional uses you'd expect for, you know, beach, beach use.

*Id.* Following the public notice and hearing, Daniels gave the Town a **<u>new</u>** temporary construction easement to facilitate the 2015 project, thus acknowledging and consenting to the project. SOF 56. The 2015 project resulted in the Daniels Beach receiving sand from the seawall to approximately

125 feet seaward, well beyond the 75-foot ECL. SOF 57; ECF [51-1] ¶ 44. Leading up to the 2015 project, Daniels did nothing to disallow the continued use of the Daniels Beach by the public. Indeed, Daniels usually stays at the property for limited months per year after 2011, SOF 5, and allowed members of the public to use the Daniels Beach for recreational purposes. SOF 37.

Even using the 2015 project as the date of accrual, Daniels' claim is time barred.

**C.     Daniels' Takings Claim Accrued by 2019—at the Latest.**

Lastly, Plaintiffs' claims to challenge the public's use rights certainly accrued by 2019.

The Mid-Town Project became federally authorized in 2018 and the USACE mandated perpetual easements from property owners that expressly acknowledged the public's use rights on sand placed upland of the ECL. SOF 60. The Town requested such a perpetual easement from Daniels in Spring of 2019, but Daniels objected. SOF 60-61. The Town contacted the USACE to modify the perpetual use easement language to satisfy Daniels. SOF 62. The Town advised Daniels that the USACE refused to remove the "permanent public use and access" language and explained that the reason was likely "[b]ecause the Town's beaches are constructed using public funding, the beaches within project areas inherently remain for the public use." SOF 63.

In a continuing effort to address the issue, the Town then sent Daniels draft language for the USACE easement, **along with a copy of Section 161.141**. SOF 64. Referring to Section 161.141 and quoting its terms, the proposed language provided:

> The terms of this paragraph *are consistent with and do not rescind the terms and provisions of Florida Statute 161.141 specifically including but not limited to the following language:*
> The resulting additions to upland property are also *subject to a public easement* for traditional uses of the sandy beach consistent with uses that would have been allowed prior to the need for the restoration project.

*Id.* Daniels understood that the Town was attempting to assuage concerns about the public use language, but he "didn't pay any attention to" the Town's reference to Section 161.141 because he believed the Town was engaged in "double talk." SOF 65. The Town subsequently advised Daniels that the USACE agreed to language consistent with the Town's proposed language referencing and quoting Section 161.141. SOF 66. Writing to another resident about the impact of the language agreed to by the USACE, in October 2019, Daniels stated:

> If you are referring to his prior language on the email below that says "The terms of Paragraph No 8 are consistent with and do not recondite [sic] **the terms and provisions of Florida Statute 161.141 specifically including** but not limited to the following language: The resulting additions to upland property are also **subject**

to **the public easement for the traditional uses of sandy beach** consistent with the uses that would have been allowed prior to the need for the restoration project. That in my opinion is bad faith double talk and definitely does change the status quo. SOF 67.

Given Daniels' interactions with the Town (in addition to all prior notice discussed above), there can be no dispute that by fall 2019—at the very latest—Plaintiffs knew or should have known of the public's easement rights arising from Section 161.141. Plaintiffs' 2025 takings claim that necessarily challenges the public's pre-existing easement rights on the Daniels Beach is barred by the four-year statute of limitations as a matter of law.

### III.  Where the Public had the Right to Use the Daniels Beach for Traditional Recreational Uses, the Town is Entitled to Judgment on the First Amendment Claim.

Where ownership of the Daniels Beach is subject to traditional recreational use rights by the public, Plaintiffs' posting of their dry sand property boundaries with monoposts and plastic cones marked "no trespassing" and "private property" in order to send the message that Plaintiffs' have exclusive use rights is false and misleading speech not entitled to any protection under the First Amendment. Plaintiffs did not seek to engage in political speech, which "is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Speech on matters of private concern like those Plaintiffs sought to speak on here receive less First Amendment protection than speech on matters of public concern. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758, 105 S.Ct. 2939 (1985) (plurality opinion).

"[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942). Courts have found that speech may be regulated to prohibit interference with the administration of the law. *See, e.g.*, *U.S. v. Kahn*, 244 Fed. Appx. 270, 272, 274 (11th Cir. 2007) (upholding permanent injunction prohibiting a person from, among other things, "preparing . . . correspondence to the IRS on behalf of another person or entity" because "injunction was tailored to prohibit the activities . . . that had frustrated federal tax administration" and did "not burden more speech than necessary to achieve the government interest of preventing . . . interference with the enforcement of the internal revenue laws"). Plaintiffs sought to communicate a message that the public had no traditional recreational use rights to the Daniels Beach. That message is incorrect. Plaintiffs' misstatement of the law frustrates and interferes with the Town's enforcement of its own laws. It is not entitled to protection of the First Amendment.

The Town is entitled to summary judgment on the First Amendment claim (Count III).

JONES FOSTER P.A.
Attorneys for Defendant
505 S. Flagler Drive, Suite 1100
West Palm Beach, FL 33401
561-659-3000; 561-650-5300 [Facsimile]

By: /s/ Joanne M. O'Connor
Joanne M. O'Connor
Florida Bar No. 498807
joconnor@jonesfoster.com
Roberto M. Vargas
Florida Bar No. 151106
rvargas@jonesfoster.com
Lainey W. Francisco
Florida Bar No. 1039558
lfrancisco@jonesfoster.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By: /s/Joanne M. O'Connor
Joanne M. O'Connor

**DANIELS v TOWN OF PALM BEACH**
**CASE NO. 9:25-cv-80368-WPD**
**SERVICE LIST**

Joseph P. Kenny, Esquire
Sanford Blaine Kinne, Esquire
Weber Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, Florida 33710
727-828-9919
727-828-9924 fax
Joseph.kenny@webercrabb.com
Blaine.kinne@webercrabb.com
Suzie.whitaker@webercrabb.com
*Attorney for Plaintiffs*

J. David Breemer, Esquire
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 954814
916-419-7111
jbreember@pacificlegal.org
*Attorney for Plaintiffs (pro hac vice pending)*

Joanne M. O'Connor, Esquire
Roberto M. Vargas, Esquire
Lainey W. Francisco, Esquire
Jones Foster P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401
561-659-3000
561-650-5300 fax
joconnor@jonesfoster.com
rvargas@jonesfoster.com
lfrancisco@jonesfoster.com
*Attorneys for Defendant*

#7521814 v1 13156-00452